**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION**

**MARCUS JENKINS,**

**Plaintiff,**

vs.                                                                                          **CASE NO.
                                                                                                Judge:**

**THE SCHOOL BOARD OF
HIGHLANDS COUNTY, FLORIDA,**

**Defendants.**
_____/

## COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES

Plaintiff, MARCUS JENKINS, by and through his undersigned counsel, sues Defendant, the SCHOOL BOARD OF HIGHLAND COUNTY, FLORIDA, and alleges as follows:

### NATURE OF THE CASE

1. This is a civil action for compensatory damages, punitive damages, other monetary relief, equitable relief, and attorney's fees, to redress unlawful discrimination in employment on the basis of race and/or color, in violation of (a) Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 e-2 ("Title VII); and (b) the Florida Civil Rights Act, sections 760.01-760.10, Florida Statutes ("FCRA"). As more particularly alleged herein, Plaintiff is entitled to the remedies prescribed by the FCRA, Title VII, and the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a.[1]

---

[1] See 42 U.S.C.A. § 1981a (b)(2): "Exclusions from compensatory damages Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964."

**JURISDICTION**

2. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, in that Plaintiff sues Defendant pursuant to a federal statute, 42 U.S.C. § 2000 e-2. The Court has supplemental jurisdiction over Plaintiff's state law (FCRA) claim, pursuant to 28 U.S.C. § 1367, as that claim is so related to a claim in the action within the Court's original jurisdiction (i.e., the Title VII claim), that it forms part of the same case or controversy under Article III of the United States Constitution.

**VENUE**

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as Defendant maintains its principal headquarters, and/or the acts and omissions giving rise to this action occurred, within the Southern District of Florida, specifically Highlands County, Florida.

**THE PARTIES**

4. Plaintiff, Dr. MARCUS JENKINS, ("Plaintiff" or "Dr. Jenkins") is, and at all times material, was, a citizen of the State of Florida and resident of Cape Coral, Florida. Plaintiff holds a Doctorate degree in Education (EdD), with a primary focus on organizational leadership, as well as a Master's Degree, focusing on the needs of the emotionally handicapped.

5. Defendant, the SCHOOL BOARD OF HIGHLANDS COUNTY, FLORIDA ("Defendant" and/or the "School Board"), is located at 426 School Street, Sebring, Florida, 33870, and is the entity duly authorized by law to operate the Highlands County School District (the "District"). Pursuant to Article IX, section 4(b) of the Florida Constitution, the District operates, controls, and supervises all free public schools within Highlands County. Pursuant to

Fla. Stat. §§1012.22(l)(a), (e) and (f), all decisions as to the hiring, termination, suspension and transfer of employees are made by the school boards and, at all times material, the Defendant, School Board had final decision-making authority regarding Plaintiff's employment. At all times material, Defendant was the employer of Plaintiff, Dr. Jenkins, and employed in excess of five hundred (500) employees.

## CONDITIONS PRECEDENT

6.      Fla. Stat. Ann. § 760.11 (4) provides, in pertinent part:

"If the commission [Florida Commission on Human Relations, a/k/a the FCHR] determines that there is reasonable cause to believe that a discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992 [FCRA], the aggrieved person may…(a) Bring a civil action against the person named in the complaint in any court of competent jurisdiction…"

Fla. Stat. § 760.11 (8), in turn, provides:

"If the commission fails to conciliate or determine whether there is reasonable cause on any complaint under this section within 180 days after the filing of the complaint:

(a) An aggrieved person may proceed under subsection (4) as if the commission determined that there was reasonable cause…"

On or about November 27, 2020, Plaintiff dual-filed a charge of race discrimination in violation of the FCRA and Title VII with the commission (FCHR) and the Equal Employment Opportunity Commission (EEOC). The commission failed to determine whether there is reasonable cause on Plaintiff's complaint within 180 days after the filing of said complaint, and therefore, Plaintiff is entitled to proceed with the within civil action as if there had been a determination of reasonable cause.

7. All other conditions precedent to the maintenance of this action have occurred and/or been met, or such conditions have been waived or excused.

## ALLEGATIONS COMMON TO ALL COUNTS

8. Prior to the 2019-2020 school year, Dr. Jenkins determined from the Defendant, School Board's website, that there was an opening for the position of Dean at Lake Placid Middle School ("LPMS"). Having been in the education profession for approximately 25 years, as a teacher, an administrator, and an adjunct college professor, and possessing both Doctorate and Master's degrees in Education, Dr. Jenkins was eminently qualified for the position.

9. Dr. Jenkins was also a star football player in high school and college, even getting a try-out with the Atlanta Falcons in the National Football League.

10. Dr. Jenkins applied for the Dean position at LPMS. He was interviewed by a panel of approximately eight or nine administrators, teachers, and staff, and he was almost immediately and enthusiastically approved for the position.  His start date was August 1, 2019.

11. In tandem with being informed that he was being hired for the Dean position, Dr. Jenkins received a phone call, and was delighted to hear people clapping and on speaker. This appreciative welcome was extended by the panel of eight or nine people that had decided favorably on his application. Dr. Jenkins had no idea at that time that his jubilance would be short-lived, and that a rocky, and ultimately dead-end, road lay ahead for him at LPMS.

12. In his position as Dean, Dr. Jenkins always reported directly to Jennifer Sanchez, a Caucasian woman, who was the principal of LPMS.

13. From the inception of undertaking his duties as Dean, Sanchez displayed a contemptuous and condescending attitude toward Dr. Jenkins. She always addressed Plaintiff as "Mr. Jenkins," or "Dr. Jenkins," and insisted upon him addressing her as "Principal Sanchez."

Sanchez virtually never looked Dr. Jenkins in the eye, and he always felt intimidated by her attitude, tone, and demeanor when they spoke

14. It was known among the staff at LPMS that Sanchez's "usual banter" included street slang terms and racially inappropriate language.

15. At the time during which Dr. Jenkins was Dean, there were approximately 800-900 students at LPMS. The composition of the student body was approximately one-third African-American, one-third Latino, and one-third Caucasian.

16. Prior to the beginning of the 2019-2020 school year, about a week before he started his position as Dean at LPMS in the school, Dr. Jenkins was informed that a 24 year-old Caucasian woman, named Jessie Morgan, would be "shadowing" him.

17. Morgan was an English, as a Second Language, Language teacher who aspired to become an administrator, and in particular, a dean. She held only a Bachelor's degree, and had very little teaching experience, and no administrative experience.

18. Dr. Jenkins observed that Morgan was unable to control the students in her class, and that they essentially ran all over her.

19. Sanchez was very friendly with Morgan, favored her over other staff.

20. Sanchez had taken the unusual step of giving Morgan two planning periods, in order to give Morgan extra time to "shadow" Dr. Jenkins.

21. There were occasions on which Morgan undermined Dr. Jenkins' authority. One such incident occurred about two months into the 2019-2020 school year, after Dr, Jenkins had administered discipline to some boys who had been involved in a fighting incident. Dr. Jenkins then observed Morgan, who held nothing more than a teaching position, speaking to the boys and, as it turned out, Morgan cancelled the discipline Dr. Jenkins had assessed, i.e., that the boys

were to spend the day in ISS (In School Suspension), and she allowed the boys to go back to class.

22. Being a dean in a public middle school is a particularly challenging position, given the challenges attendant to the transition of young people from children to teenagers. A core responsibility of the LPMS Dean position was to enforce rules and policies, and administer discipline, and Dr. Jenkins was chief disciplinarian at LPMS. The Dean position was/is one that requires the ability to exercise control and a firm hand in dealing with the students, and concomitantly, to understand, relate to, and empathize with the kids.

23. The socio-economic conditions in the locale were such that many of the students at LPMS came from broken homes and troubled backgrounds, and lived in poverty. Some students were even gang members, or otherwise involved with the drug culture and violence. But in light of his background, education, and prolific experience, Dr. Jenkins was particularly well-suited to work with the students and to deal with their issues. Although he is a rather imposing figure physically, and had eight years of experience as a disciplinarian prior to earning the Dean position, among Dr. Jenkins' greatest strengths are his personable and gentle nature, and his talent for getting along with young students.

24. The only other African-American male staff member at LPMS was Willie Hill, who held the position of Assistant Principal in and around 2018, prior to Dr. Jenkins being hired. There had reportedly been "turmoil" between Sanchez and Hill, which apparently resulted in Hill's demotion and/or transfer to Transportation, and ultimately, Hill's departure from LPMS..

25. When Dr. Jenkins would make disciplinary decisions in his capacity as Dean, Sanchez would very often disregard his recommendations and undermine or overrule his decisions and the actions he took.

26. On one occasion, Dr. Jenkins made a recommendation for a Caucasian boy who was caught "vaping" in the restroom that the boy be taken to an alternative school. Sanchez, overruled that decision, and strongly implied to Plaintiff that he was to take care of the Black population and that she was going to be taking care of the white and Latino kids. She told him that she would make the rules.

27. On one occasion, Dr. Jenkins decided to change the décor of his office, by taking various accolades and commemorations he had received in his illustrious football and academic careers down from the wall, intending to take those items to his home.

28. When Sanchez thereafter came into Dr. Jenkins office and saw that he had removed the items from the wall, she asked, "Are you planning on quitting? Because your office is bare." Plaintiff responded that he wanted to take these personal items back home.

29. Sanchez then demanded that he put it all back, saying, "This is my school, I make the changes," and that it was her prerogative "to overrule things."

30. As early as October 2019, Dr. Jenkins realized that he was being excluded from meetings and emails. Sanchez, Morgan and Jenny Cornell (Assistant Principal) kept him out of the loop, not apprising him as to what was happening administratively, not including him in decision-making, and not communicating with him as to how things should happen. Essentially, the trio stopped communicating with Dr. Jenkins altogether.

31. During the entire time Dr. Jenkins was employed by the Defendant, School Board as Dean of LPMS, he never received a single disciplinary notice or write-up. His personnel file reflects his unblemished record as Dean, and as an exemplary employee of the School Board.

32. As it turned out, Dr. Jenkins would only actually be physically on the LPMS campus until approximately February 2020, as in or about March 2020, the school was basically on lockdown due to the Covid pandemic.

33. On or about May 21, 2020, Sanchez represented to Dr. Jenkins that there would be a ZOOM conference wherein he would be asked to identify areas and make suggestions as to ways the educational experience at LPMS could be improved for the upcoming 2020-2021 school year.

34. Much to Dr. Jenkins' surprise, when he entered the conference, only Sanchez and Cornell were present.

35. Despite what Dr. Jenkins had been told would be the subject matter of the ZOOM conference and his good faith preparation to make a presentation on his recommendations for the upcoming 2020-2021 school year, there was no discussion whatsoever of the alleged agenda topics. Instead, Sanchez instead summarily informed him that his contract as Dean of LPMS was not being renewed for the 2020-2021 school year.

36. Dr. Jenkins was shocked, confused, hurt, and exceedingly dismayed. He pleaded for the opportunity to stay in his position as Dean, pointing out that he had fulfilled all his administrative duties, and that, in light of his financial obligations, losing his job would cause him serious financial hardship and damage to his career.

37. In spite of his pleas, Dr. Jenkins was never given any reason or cause for why he was being terminated as Dean of LPMS.

38. Thereafter, Dr. Jenkins received formal notifications of his termination from Human Resources. Said notifications are attached hereto as **Exhibit A & B**. Plaintiff's compensation by Defendant ceased after August 2020.

39. Subsequently Dr. Jenkins requested and received a meeting with School Board Superintendent, Brenda Longshore, and Assistant Superintendent, Andrew Lethbridge.

40. In the meeting, Dr. Jenkins again pled for his job, emphasizing the same serious financial and professional concerns he had related to Sanchez and Cornell.

41. Dr. Jenkins pleas at the meeting were to no avail. Longshore and Lethbridge turned a deaf ear to his plight, and in fact, gave Plaintiff no reason or cause whatsoever for the non-renewal of his contract.

42. During the meeting with Dr. Jenkins, the Superintendents admitted that other staff members had reported that Sanchez exhibited favoritism to certain individuals.

43. The Superintendents told Dr. Jenkins to go on the District's portal and just look for a job and apply. Plaintiff did that at various times to see if there was any jobs available, and when he did apply for a job, he did not get it.

44. To add insult to injury, the Superintendents told Dr. Jenkins, who holds a Doctorate in Education, and had 25 years of combined teaching and administrative experience, that he could always be a substitute teacher in the District (at the approximate rate of $10 per hour).

45. By way of even further insult, at the conclusion of the meeting, one of the Superintendents asked that the three of them "join hands in a closing prayer," during which one of the Superintendents presumptuously invoked the name of Dr. Jenkins' deceased mother.

46. What Dr. Jenkins did not realize at the time, but subsequently learned, was that back on March 25, 2020, at 7:32 PM, Principal Sanchez had sent a text message to another LPMS staff member named Michael Ridgeway, which stated, in context, as follows:

Sanchez: "We'll talk more on Thursday morning."

Ridgeway: "Who is this? And what is this test make up that you speak of?'

Sanchez: "This is your favorite principal! And the test niggas are going to be super fun. More info to come."

Ridgeway: "Well you are in luck. I will do whatever needs to be done."

(Copy of transcription of subject text thread attached hereto as **Exhibit C**.)

47. The malicious meaning of Sanchez's racial slur, when considered in this particular context, was that it would somehow be "super fun" to watch young, unintelligent Black children at LPMS struggle with the standardized test to be administered to them, the so-called "test niggas" clearly being a reference to the prospective Black student examinees.

48. The School Board became aware of the foregoing text message/thread when a formal complaint was lodged, and began an investigation.

49. In the course of the investigation, Sanchez insisted there was no way that she could have sent such a racially repugnant message. She professed that she was at a school meeting that night, and that someone must have somehow unlocked her phone, and sent the message to sabotage her.

50. The School Board engaged the services of a Forensic Technician from the Digital Forensic Lab with the Highlands County Sheriff's Office, to investigate whether or not the theory Sanchez had asserted was plausible. The results of the forensic testing can be summarized in the two-word note regarding the issue, written by Assistant Superintendent Lethridge, dated November 3, 2020: "Cannot happen."

51. During the racial slur investigation, Sanchez was suspended from her Principal position, but at the conclusion of the investigation, inexplicably, the School Board kept Sanchez on as an employee, providing her with a teaching position at the District's virtual school, while

leaving 52-year-old Dr. Jenkins out in the cold. Ironically, the position Defendant provided to Sanchez involves her teaching ESOL (English as a Second Language) minority students.

52. In the wake of the termination of Dr. Jenkins, he was replaced by not one Caucasian, but two Caucasians.  One, to no surprise, his "shadower", Ms. Morgan, who was the long inexperienced neophyte; but also by an even less experienced, Caucasian individual Daniel Bova.  Said Defendant, The School Board of Highlands County, and/or Principal Sanchez, going to a two dean septum, to replace Plaintiff for the following school year.

53. Since learning of the unlawful and racially discriminatory termination of his employment as Dean of LPMS, and as a proximate result thereof, Dr. Jenkins has suffered and continues to suffer, severe emotional distress, mental anguish, psychological injury, humiliation, loss of dignity, loss of enjoyment and quality of life, economic/pecuniary loss, loss of future earning capacity, injury to his reputation and professional standing, which in turn has resulted in a narrowing of economic opportunities, and he has further suffered, and continues to suffer, severe anxiety and worry about his reputation, his finances, and the bleak future of his career as an administrator in the education profession.

54. In addition, although Plaintiff has made reasonable attempts to mitigate damages, he will suffer future pecuniary losses.

55. Forced to take a teaching position in another school district, with less pay and benefits, Dr. Jenkins rightfully and demonstrably believes that his career as an administrator, or some other higher level position in public education has been derailed, if not completely destroyed, by the racially discriminatory actions of the School Board and its agents.

## COUNT I

**Discrimination in Employment on the Basis of Race, in Violation of Title VII**

56. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 55, inclusive, as though fully set forth herein.

57. Title VII of the Civil Rights Act (42 U.S.C. § 2000e–2) makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

58. The Defendant, School Board, in intentionally and unlawfully: (a) failing or refusing to hire Plaintiff, Dr. Marcus Jenkins; and/or (b) discharging him from employment; and/or (c) discriminating against him with respect to employment opportunities; and/or (d) adversely affecting his status as an employee, because of his race and/or color, engaged in an unlawful employment practice(s).

59. At all times material, Plaintiff, Dr. Marcus Jenkins (1) was a member of a protected group or class, in that that he is Black and/or African-American; (2) was qualified for the position of Dean at LPMS; (3) suffered adverse employment action; and (4) was replaced in the position by white/Caucasian individuals, thereby giving rise to a presumption that the Defendant, School Board unlawfully discriminated against Plaintiff.

60. Defendant did not have a legitimate non-discriminatory reason(s) for the employment decision it made with respect to the non-renewal of Dr. Jenkins' contract as Dean of LPMS, and/or for Defendant's termination of Plaintiff from said position, and/or for Defendant's failure or refusal to hire Plaintiff for said position, and/or for adversely affecting Plaintiff's status as an employee. Defendant will be unable to produce evidence sufficient to establish such

legitimate non-discriminatory reason(s) and to thereby rebut the presumption that it unlawfully discriminated against Plaintiff, and accordingly, "the court must enter judgment for the plaintiff because no issue of fact remains in the case."[2]

62. Any reason(s) Defendant may purport to proffer, if any, for the subject employment decision it made with respect to Dr. Jenkins would be a pretext for unlawful race discrimination, as it is more likely that the adverse employment action was motivated by a racially discriminatory reason, and/or that the proffered reason is not the true reason for the employment decision.

62. As a direct, foreseeable and proximate result of the School Board's violation of Title VII, Plaintiff has suffered, and continues to suffer harm, as more particularly described in paragraphs 53 and 54, above, and is therefore entitled to compensatory damages to redress such harm, as prescribed by 42 U.S.C. § 1981a.

63. Further, Plaintiff is entitled to other and further relief, as prescribed by 42 U.S.C. § 2000-e, and as otherwise allowable by law.

64. Plaintiff has retained the legal services and representation of the undersigned, and will incur reasonable attorney's fees in connection with such services and representation.

**WHEREFORE** Plaintiff demands a trial by jury on all issues so triable and prays for the following relief:

1. Compensatory damages, according to proof, to compensate Plaintiff for present and future economic, emotional, psychological, reputational, and other harm he has suffered and will suffer in the future;

2. Back pay;

---

[2] *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

13

3. Reinstatement to the position of Dean in the Highlands County School District, or to a comparable or higher administrative position, with comparable or higher compensation, together with front pay for the period between Judgment and commencement of reinstatement, or, in the alternative, if it is shown, or by stipulation agreed, that antagonism, adversity, or hostility between the parties may render reinstatement impracticable, then, in lieu of reinstatement, an award of front pay that is, in the Court's discretion, sufficient to compensate Plaintiff in the cumulative amount Plaintiff would have received between the time of judgment and his expected retirement at age 65, had he been reinstated;

4. Reasonable Attorney's fees;

5. Costs and expenses of suit; and

6. Such other and/or further relief that the Court may deem proper and just.

## COUNT II

### Discrimination in Employment on the Basis of Race, in Violation of The Florida Civil Rights Act (FCRA)

65. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 57, and paragraphs 61 through 63, as though fully set forth herein.

66. Fla. Stat. Ann. § 760.01 provides, in pertinent part:

"(1) Sections 760.01-760.11 and 509.092 shall be cited as the 'Florida Civil Rights Act of 1992.'

(2) The general purposes of the Florida Civil Rights Act of 1992 are to secure for all individuals within the state freedom from discrimination because of race [and/or] color…and

thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

(3) The Florida Civil Rights Act of 1992 shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved."

67. Fla. Stat. § 760.07 provides, in pertinent part:

"Any violation of any Florida statute that makes unlawful discrimination because of race [and/or] color in the area[] of…employment…gives rise to a cause of action for all relief and damages described in s. 760.11(5), unless greater damages are expressly provided for."

68. Fla. Stat. Ann. § 760.11 (5) provides, in pertinent part:

"In any civil action brought under this section, the court may issue an order prohibiting the discriminatory practice and providing affirmative relief from the effects of the practice, including back pay. The court may also award compensatory damages, including, but not limited to, damages for mental anguish, loss of dignity, and any other intangible injuries, and punitive damages."

69. As a direct, foreseeable and proximate result of the Defendant, School Board's violation of The Florida Civil Rights Act (FCRA), Plaintiff has suffered, and continues to suffer harm, as more particularly in paragraphs 53 and 54, above, and is therefore entitled to damages, as recoverable under the FCRA and other applicable law, to redress such harm.[3]

---

[3] "Claims brought under the FCRA…are subject to the same legal framework as Title VII claims." *Lewis v. Sch. Bd. of Palm Beach Cty., Fla*., 850 F. App'x 674, 678 (11th Cir. 2021) (citing *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009)). "We and other Florida districts have recognized that The FCRA

70. Fla. Stat. Ann. § 760.11 (5) further provides, in pertinent part:

"The judgment for the total amount of punitive damages awarded under this section to an aggrieved person shall not exceed $100,000. In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs…"

71. Consistent with the analytical framework used to determine whether a Title VII plaintiff is entitled to punitive damages, Dr. Jenkins is entitled to recover punitive damages under his FCRA claim, in that: (1) Defendant, School Board acted with knowledge that its actions may have violated federal and/or state law, or in the face of a perceived risk that its actions would violate federal and/or state law; (2) liability may be imputed to Defendant as the employees of Defendant involved in the unlawful action were acting within the scope of their employment at all times material; and (3) the Defendant did not engage in good faith efforts to comply with Title VII.[4]

72. Plaintiff has retained the legal services and representation of the undersigned and will incur reasonable attorney's fees in connection with such services and representation Florida law allows prevailing parties to recover attorney fees consistent with federal case law interpreting Title VII.

**WHEREFORE** Plaintiff demands a trial by jury on all issues so triable, and prays for the following relief:

---

is patterned after Title VII and that federal case law on Title VII applies to FCRA claims." *Palm Beach Cty. Sch. Bd. v. Wright*, 217 So. 3d 163, 165 (Fla. Dist. Ct. App. 2017) (internal quotations omitted)

[4] *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F.Supp.2d 1303, 1320 (S.D. Fla. 2004).

1. Compensatory damages, according to proof, to compensate Plaintiff for present and future economic, emotional, psychological, reputational, and other harm he has suffered and will suffer in the future;

2. Back pay;

3. Reinstatement to the position of Dean in the Highlands County School District, or to a comparable or higher administrative position, with comparable or higher compensation, together with front pay for the period between Judgment and commencement of reinstatement, or, in the alternative, if it is shown, or by stipulation agreed, that antagonism, adversity, or hostility between the parties may render reinstatement impracticable, then, in lieu of reinstatement, an award of front pay that is, in the Court's discretion, sufficient to compensate Plaintiff in the cumulative amount Plaintiff would have received between the time of judgment and his expected retirement at age 65, had he been reinstated;

4. Punitive Damages;

5. Reasonable Attorney's fees;

6. Costs and expenses of suit; and

7. Such other and/or further relief that the Court may deem proper and just.

Dated:  January  24, 2022.                             Respectfully submitted,

   /s/ Dennis L. Webb  
Dennis L. Webb, Esq.  
Florida Bar No.  165956  
Law Offices of Dennis L. Webb, P.A.  
2080 McGregor Blvd., Suite 200  
Fort Myers, FL 33901  
(239) 334-1600 – Telephone  
(239) 334-7979 – Facsimile  
E-mail:         dennis@swflalawyers.com

laci@swflalawyers.com  
naelene@swflalawyers.com  
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by electronic filing with the Clerk of Court through E-Filing Portal System on 24 day of January 2022 on all counsel or parties of record on the Service List below.

        /s/ Dennis L. Webb  
        Dennis L. Webb, Esq.

## SERVICE LIST

Allen C. Sang, Esq.  
Beauchamp, Sang, Gonzalez & Philpott, P.A.  
1850 Lee Road, Suite 334  
Winter Park, FL 32789  
(407) 622-7888 – Telephone  
(407) 622-7890 – Facsimile  
E-mail:   acs@beauchampsang.com  
          kks@beauchampsang.com  
*Attorney for Defendant*